```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


UNITED STATES OF AMERICA,       )
                                )
         Plaintiff,             )
                                )
    v.                          )      No. 4:11 CR 499 JCH / DDN
                                )
WARNELL REID,                   )
                                )
         Defendant.             )
```

**REPORT AND RECOMMENDATION**

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).

Pending are the motions of defendant Warnell Reid to suppress evidence (Docs. 17, 27, 28) and the motion of the United States for a determination of the admissibility of any arguably suppressible evidence (Doc. 18). An evidentiary hearing was held on January 13, 2012.

From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:


**FACTS**

1.  Around 6:30 a.m. on October 10, 2011, Deputy United States Marshals, including Ryan McDaniel and Jeremy Wyatt, and other law enforcement officers[1] arrested Earnestine Graham at her residence at 712 Thrush Ave. in the City of St. Louis, pursuant to an arrest warrant issued by this court in Case No. 4:07 CR 244 JCH.[2] Before going to Graham's residence, the officers met and planned how the arrest operation was to be carried out. During this meeting, nothing was known or mentioned about Warnell Reid.

2.  Upon arriving at 712 Thrush, a single family residence, the officers surrounded the residence. A deputy knocked on the front door.

---

[1]Among these other law enforcement officers were federal Task Force Officers (TFO) William Alphin and Anna Kimble, both Metropolitan St. Louis Police Detectives.

[2]The deputies did not have a search warrant for Graham's residence.

The deputies saw that the front door was already cracked open a little bit, but not fully open. Deputy McDaniel pushed the door all the way open and saw Earnestine Graham standing eight to ten feet from the front door in the middle of the large room. She was dressed in her pajamas. He asked Ms. Graham to step toward the deputies who were still outside the front door. After a brief discussion, Ms. Graham stepped up to the deputies and stood in the doorway. Deputy McDaniel told her to turn around, she did so, he placed handcuffs on her wrists, and he pulled her to the outside of the door. At that time Deputy McDaniel told Ms. Graham why she was under arrest.

3. At this time, the deputies knew about Graham only that she was alleged to have made a false statement. They had no specific factual reason to believe she might be violent or possess a firearm, nor did the deputies have specific knowledge of anyone else being in the house. From their training and experience, however, the deputies reasonably believed that someone else or something could be in the residence that would present a danger to them. Therefore, in effecting her arrest, the deputies engaged in the usual security actions, including initially surrounding the residence and later performing a security sweep of the residence.

4. Because Graham was dressed in her pajamas, the deputies intended to allow her to re-enter her residence for the purpose of getting dressed to leave the residence. Immediately after telling her why she was being arrested, Deputy McDaniel asked Graham if there was anyone else in the residence. She said that the only others there were her minor children. The deputies did not know the ages or capacity of the children other than that they were minors. However, they intended not to leave any minor child uncared for when they took Ms. Graham away from the residence in custody. Therefore, the deputies determined to enter the residence to assess the needs of the minor children[3] and to allow Ms. Graham to get dressed.

---

[3]In the past, the deputy Marshals have called on local government agencies, like the Missouri Department of Family Services (DFS), or the subject's family members to come to the residence to care for minor children in the residence who would otherwise be unattended.

5.      Deputy McDaniel and other officers then entered the residence with Ms. Graham and went with her into the front room.  Immediately inside the front door were two rooms on that level, a bedroom to the right and a kitchen that was adjacent to the bedroom.  Also on the entry level was a set of stairs to the basement and a set of stairs to an upper floor.  Immediately upon entering the residence, the deputies conducted a security sweep of the residence.  Before Graham was allowed to enter her bedroom, the one to the right on the entry level, to dress herself in the presence of a female deputy, an officer entered the bedroom and conducted a security sweep for firearms.  Immediately upon entering the bedroom, the deputy saw in plain view what immediately appeared to be an SKS assault rifle[4] laying against the wall, which was seized.  Graham was asked to whom the weapon[5] belonged.  She stated that it belonged to her boyfriend.

6.      Not all of the law enforcement officers in the arrest detail went inside the residence.  Some officers remained outside throughout the operation.  Information about the discovery of the firearm was communicated to the officers outside.  Deputy Marshal Wyatt remained outside for a while.  After the discovery and seizure of the weapon, a man later identified as Warnell Reid drove up and parked in front of the residence next to the Graham residence.  He got out of his car, leaving a female occupant inside the car, and started walking down the sidewalk toward 712 Thrush.  When Reid appeared to observe the police and Deputy Wyatt,[6] he immediately turned and began walking back toward his car. Wyatt called out, "Police, hold on" to the man.  Reid did not stop, but kept walking toward his car.  Based upon this individual's suspicious actions and because Deputy Wyatt did not know who the individual was or

---

[4]Later, the weapon was determined to be a sawed-off shotgun and was referred to as such while the officers were still in the residence.

[5]The officers knew it was generally illegal for a sawed-off shotgun to be possessed by anyone.

[6]All of the law enforcement officers wore clothing and equipment that bore language that identified them as members of the Marshals Service or another law enforcement organization.

why he was there, he asked the individual who he was. Reid made no response to this question. No other questions were asked him at that time.

7. For security reasons and to keep him from leaving the area, the officers outside the residence took the keys from the vehicle's ignition. Reid was detained as a security measure for the officers inside the residence, because the officers reasonably believed that he might have a firearm on his person based on his possible involvement with the firearm seized inside the residence. For this reason and in order to identify him, Deputy Wyatt detained him. Deputy Wyatt also patted Reid down for weapons and found none. TFO Alphin, who was stationed across the street, asked a nearby resident if she knew who the individual was. She said, "Yes, this is Earnestine Graham's boyfriend." The officers then checked Reid for identification and found a photo driver's license, which identified him as Warnell Reid. Because Reid was identified as the person Graham referred to as the owner of the weapon seized from the bedroom, the officers formally arrested Reid without a warrant for possession of the firearm.[7] Thereafter, Wyatt intended to turn Reid over to the federal Bureau of Alcohol, Tobacco, and Firearms (ATF).

8. Unrelated to Reid, inside the residence, the officers encountered a padlocked door in the kitchen. The deputies asked Graham for a key to the padlock. She said she did not have a key for the padlock, but that her boyfriend put the padlock on the door and that he had a key to the lock on his key ring. She said he also had a key to the front door. Deputy McDaniel went outside the residence to the deputy who had Reid's keys.

9. Upstairs, during their protective sweep of the residence, the officers found Ms. Graham's six minor children (aged approximately 3 to

---

[7]At this time, Deputy Wyatt did not know whether the seized weapon had been illegally possessed. Deputy McDaniel believed the weapon had been illegally possessed because of its length. See 26 U.S.C. § 5845(a) (including among prohibited weapons a shotgun having a barrel or barrels of less than 18 inches in length or having an overall length of less than 26 inches).

16) and two adults. The adults were Graham's brother and his girlfriend.[8] The children and the adults were brought to the living room area for security purposes. TFO Kimble fed the children in the residence. Graham did not object to the security sweep or the feeding of the children.

10. After the security sweep was finished, the deputies asked Graham whether there were any other weapons in the house. Graham said "No" and that the seized weapon was not hers. Deputy McDaniel then orally advised her of her rights to remain silent and to counsel.

11. Next, Deputy McDaniel asked Graham whether she would sign a "Consent to Search" form. He then gave her such a form. On the form the deputies handwrote the location address, "712 Thrush Ave., St. Louis, Mo. 63147," the date, "11-17-11," Graham's name, and the names of deputies McDaniel and Mark Moore as the people to whom permission to search was being given. The form stated:

> I, Earnestine Graham having been informed of my constitutional right not to have a search made of my premises hereinafter mentioned without a warrant and of my right to refuse to consent to such a search, hereby authorize Brian McDaniel and Mark Moore, Deputies of the United States Marshals Service, United States Department of Justice, to conduct a complete search of my premises located at 712 Thrush Ave, St. Louis, Mo. 63147.
>
> These Deputies are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.
>
> This written permission is being given by me to the above-name[d] person(s) voluntarily and without threats or promises of any kind.

Ms. Graham signed the bottom of the form and her signature was witnessed by two deputies. Gov. Ex. A.

12. Within 30 minutes after the deputies entered the residence and after they had finished the protective sweep, other relatives of Graham arrived at the residence. Because these adults were present, the deputies did not call on the DFS for assistance in caring for the children. Instead, the deputies left the children in the care of

---

[8]Graham had falsely told the deputies that only her minor children were present.

Graham's family members who were present.

13.  At the residence, Deputy McDaniel questioned Earnestine Graham about Warnell Reid.  In answer to his questions, she said that Reid lived in the residence and that he had a key to the front door and a key to the padlock on the door in the kitchen.

14.  After the Consent to Search form was signed by Graham, the deputies more carefully searched the residence and found another rifle,[9] a disassembled pistol, and ammunition, contrary to Graham's earlier statement that there was no other firearm in the residence.  Also seized from the same bedroom were papers that indicated that Reid lived there.

15.  Later, when looking through the keys on the key ring taken from Reid's car, Deputy McDaniel asked TFO Alphin whether a particular key was a padlock key.  Reid, who was being detained nearby, overheard the question and, without him being asked a question, said to McDaniel that that was the key to the padlock.  Deputy McDaniel then confirmed that the subject key opened the padlock and that a key to the front door of the residence was also on the ring.

16.  After the security sweep and after the house was deemed safe, Det. Kimble took Earnestine Graham into her bedroom where she changed into regular clothes.

17.  After Warnell Reid was placed under arrest, the Marshals Service notified the St. Louis office of ATF about the arrest and the seizure of an illegal firearm, the sawed-off shotgun.  ATF Special Agent Joseph Frank was notified of this information and he went to 712 Thrush.  En route, he was notified by the ATF office that Reid had previously been convicted of a felony and that any possession by him of a firearm was a violation of federal law.[10]  By the time he arrived, around 10:30 a.m., the residence had been secured and Reid formally arrested.  In a back bedroom of the residence, Agent Frank interviewed two persons who gave statements linking Reid with the seized firearms.  From the same people,

---

[9]This was a shotgun seized from a window sill in the same bedroom where the other weapon had been found and seized.

[10]Later, it was determined that the overall length and the barrel length of the shotgun were legal.

Agent Frank learned that Reid was a daily user of heroin. Other persons gave other officers similar information.

18. Around 11:30 a.m., after Agent Frank had been at the scene about one hour, the Marshals Service transported Reid to the ATF office. In the ATF building parking lot, the ATF agents took custody of Reid from the deputy marshals. The agents then took Reid inside to their office and put him in an interview room.[11] Reid's personal property was inventoried.[12] This included $582 in U.S. currency. This currency was seized and placed in the ATF vault as evidence of narcotics sales, given Reid's use of heroin. The seized firearms were also secured in the ATF evidence vault. The seized papers that indicated Reid's involvement with the residence, hypodermic needles and syringes, clothing, a toothbrush, and a cell phone were also placed in the evidence vault.

19. Around 11:40 a.m., ATF Agents Frank and Winn began the interview of Reid by providing him with a form captioned "Advice of Rights and Waiver," Government Ex. B. On the form, Agent Winn handwrote Reid's name on the signature block as "Wardell Reid." Frank orally read to Reid the statements of five rights on the form and the paragraph captioned "Waiver" also printed on the form. Although he was asked, Reid refused to place his initials next to the individual five statements of rights on the form. Next, Reid signed the form, using the name "Wardell Reid,"[13] thereby expressly acknowledging he understood his rights and waived them. Agents Frank and Winn signed the form as witnesses to Reid's signing.

---

[11] The interview room contained 3 chairs and a computer monitor.

[12] Special Agent Joseph Frank testified, and the undersigned finds, that Reid was searched by the Marshals Service on the scene immediately after he was formally arrested. Reid was searched again by ATF at the ATF office, but no contraband was found on him at that time. The previously seized personal property of Reid was inventoried at the ATF office. During the suppression hearing, the government agreed to provide defense counsel with a copy of the inventory sheet.

[13] Defendant is charged in the instant indictment as "Warnell Reid." Agent Frank testified that Reid has used "Wardell Reid" as an alias name in the past.

20. Thereafter, the agents questioned Reid. Reid appeared to understand the questions and answered them appropriately. At the beginning of the interview, Reid did not appear to be sleepy. Reid told the agents that he had used heroin earlier that morning, but that he was now fine. Thinking that Reid might vomit because his body could be withdrawing from the heroin usage, Agent Frank asked Reid whether he was sick. Reid said he was not sick. During the interview, in answer to the agents' questions, Reid stated that during the time he lived at 712 Thrush with Graham, he had seen the firearms. Reid also specifically described the two long guns and the disassembled handgun that were seized at the residence. He stated that he had touched both of the long guns and some of the shotgun shells, and had moved them while he cleaned up around the house. However, he would not answer the agent's question about the last time he had been at 712 Thrush. Near the end of the interview he said that he was tired. During the interview, Agent Frank periodically left the room for a short time. At no point during the interview did Reid ask for an attorney. Occasionally Reid would pause before answering a question, but he never tried to stop the interview. Toward the end of the interview, Reid started to doze off, and after the interview, Reid fell asleep in the ATF cell. The interview lasted about 30 minutes. The interview was not audio or video recorded. Reid gave no written statement.

21. After the interview, when the agents were transporting him to the nearby St. Louis Justice Center, Reid appeared sleepy and told them that he had been up since early morning.

22. During the period January to October 2011, Jennifer Grierson was Warnell Reid's Missouri state Probation and Parole Officer. During this period of time, Reid regularly reported to her at her office. When he did so, he was required to fill out part of a form captioned "Supervision Report" and to sign the form midway down the left side. On certain of the forms, signatures of Reid are indicated as follows:

    January 12, 2011--"Warnell Reid"
    February 16, 2011--"W Reid"
    March 16, 2011--"W Reid"
    April 25, 2011--"Warnell Reid"

June 20, 2011--"Warnell Reid"

September 20, 2011--"W Reid" and

October 3, 2011--not signed

See Def. Ex. A. The signatures placed on these forms appear different[14] from the signature he wrote on the "Advice of Rights and Waiver" form, Gov. Ex. B.

23. When Probation and Parole Officer Grierson met with Reid during his supervision visits to her office, Reid did not tell her that he used heroin shortly before he signed the forms. However, he did tell her that he was using heroin while on supervision. Although Reid usually reported to her office on the required day, he also usually reported later in the day than the time of day set for the visit.

**DISCUSSION**

Defendant Reid has moved to suppress his statements and the physical evidence the government has obtained from his vehicle, person, and the residence at 712 Thrush. He argues that the protective sweep of the residence was made without knowledge of any exigent circumstances or any threat to the officers. He also argues that the officers did not have reasonable suspicion to stop him and did not have probable cause to arrest him. He argues that his statements should be suppressed because he was not read his Miranda rights before making them, because he was under the influence of heroin withdrawal when he made them, and because he was falling asleep toward the end of the interview.

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

---

[14]This finding is made by the undersigned from my own examination of the signatures. The undersigned is unable to find that Reid signed the Supervision Report forms. Witness Grierson testified that the signatures on Gov. Ex. B and Def. Ex. A did not appear the same, that she did not see Reid sign the Supervision Report forms, that she has no reason to think someone else signed the forms, and that she does not know what his usual signature looks like.

and the persons or things to be seized." Id. The goal of the Fourth
Amendment is to ensure that a search will be carefully tailored to its
justifications and will not become a wide-ranging exploratory search.
Maryland v. Garrison, 480 U.S. 79, 84 (1987).

**Discovery of the Shotgun**

"Ordinarily, the arrest of a person outside of a residence does not
justify a warrantless search of the residence itself." United States v.
DeBuse, 289 F.3d 1072, 1074 (8th Cir. 2002). An officer may, however,
accompany an arrestee into her residence to obtain clothing or
identification. Id. "Even absent an affirmative indication that the
arrestee might have a weapon available or might attempt to escape, the
arresting officer has authority to maintain custody over the arrestee and
to remain literally at [the arrestee's] elbow at all times." Id.
(citation omitted); accord Washington v. Chrisman, 455 U.S. 1, 6-7 (1982)
("[I]t is not unreasonable under the Fourth Amendment for a police
officer, as a matter of routine, to monitor the movements of an arrested
person, as his judgment dictates, following the arrest.").

When the deputies arrested Graham at 712 Thrush, she was dressed in
her pajamas. Following the arrest and a brief discussion, the deputies
allowed Graham to reenter 712 Thrush to change her clothes. Although the
deputies had no specific reason to suspect danger to them or that Graham
might attempt to escape, the deputies were entitled to enter the
residence immediately before or with[15] Graham and to remain with her as
she changed clothes. Debuse, 289 F.3d at 1074-75 (holding that where the
defendant "chose to reenter his house simply for his own convenience[,]
[a]llowing reentry on the condition that the officers accompany him was
reasonable"); cf. United States v. James, No. 1:07CR00057 ERW (FRB), 2007
WL 2908886, at *4 (E.D. Mo. Oct. 4, 2007) (holding that the officers were
permitted to enter the arrestee's bedroom in order to locate clothing for
the arrestee and to search the clothing prior to presenting it to the

---

[15]At the hearing, Deputy McDaniel testified that the deputies
"escorted" Graham into her bedroom, and that the purpose of the escort
was to ensure that there were no other individuals or weapons in the
bedroom.

- 10 -

arrestee to wear). Upon entry into Graham's bedroom, a deputy saw the sawed-off shotgun laying against the wall; the sawed-off shotgun was in plain view. Knowing that it was generally illegal for a sawed-off shotgun to be possessed by anyone,[16] the deputy was permitted to seize the firearm. DeBuse, 289 F.3d at 1074 ("[C]ontraband seen by an officer in plain view while accompanying the arrestee in his home may be lawfully used against the arrestee.").

In addition, the deputies were permitted to enter the residence to prevent harm to Graham's unattended minor children.[17] A "legitimate concern for the safety of individuals may constitute exigent circumstance justifying warrantless entries and searches." United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004); accord United States v. Poe, 462 F.3d 997, 1000 (8th Cir. 2006) ("[W]arrantless entry into a residence may be justified if an officer has a reasonable fear of harm."). Whether exigent circumstances existed depends on whether "an objectively reasonable officer on the scene would have sufficient grounds to believe an exigency existed." Id.

Immediately after arresting Graham and telling her why she was being arrested, Deputy McDaniel asked Graham if there was anyone else in the residence. Graham responded that her minor children were the only others

---

[16]As noted in n.7, the deputies did not know of Reid's prior felony conviction at this time.

[17]The government argues that the deputies were permitted to conduct a protective sweep of the residence pursuant to Maryland v. Buie, 494 U.S. 325 (1990), based upon Graham's statement that her minor children remained alone in the house. Buie, however, is inapplicable because the bedroom was not a space "immediately adjoining the place of arrest from which an attack could be immediately launched," nor did the deputies have "a reasonable belief . . . that the area to be swept harbor[ed] an individual posing a danger" to them. Buie, 494 U.S. at 334, 337. Rather, the propriety of the officers' warrantless entry into the residence is analyzed under the exigent circumstances exception to the warrant requirement. See generally Mincey v. Arizona, 437 U.S. 385, 392-93 (1978) (articulating exigent circumstances exception to the warrant requirement); see United States v. Taylor, 624 F.3d 626, 632 (4th Cir. 2010) (applying exigent circumstances exception to similar situation); United States v. Bradley, 321 F.3d 1212, 1215 (9th Cir. 2003) (same); United States v. Tamborello, No. CR 10-0028, 2010 WL 2802603, at *4-6 (N.D. Iowa July 15, 2010) (report and recommendation) (same), adopted by 2010 WL 3310361 (N.D. Iowa Aug. 18, 2010).

in the residence.[18]  Because the deputies intended to transport Graham in custody from the residence, they reasonably believed that they should not leave Graham's minor children unattended at the residence for an indefinite amount of time.  The deputies' concern for the welfare of Graham's unattended minor children gave them sufficient grounds to enter the residence in search of the children.  See United States v. Taylor, 624 F.3d 626, 632 (4th Cir. 2010) ("[T]he absence of responsible adult supervision of children is an exigent circumstance justifying a warrantless entry." (citation omitted)); United States v. Bradley, 321 F.3d 1212, 1215 (9th Cir. 2003) ("The possibility of a nine-year-old child in a house in the middle of the night without the supervision of any responsible adult is a situation requiring immediate police assistance."); United States v. Tamborello, No. CR 10-0028, 2010 WL 2802603, at *4-6 (N.D. Iowa July 15, 2010) (report and recommendation) ("[T]he officers had a reasonable belief that a warrantless entry into the house was necessary to check on the welfare of the children and ensure their safety."), adopted by 2010 WL 3310361 (N.D. Iowa Aug. 18, 2010).

Therefore, the deputies were permitted to accompany Graham into her bedroom to change clothes and to enter the residence to find the unattended minor children.  Thus, the deputies' entry into the residence and subsequent discovery of the sawed-off shotgun, which was in plain view, was not a violation of the Fourth Amendment.[19]

**Seizure, Detention, and Arrest of Reid**

If a police officer has a reasonable, articulable suspicion that a person is committing or is about to commit a crime, the officer may

---

[18]Although the deputies also found two adults, Graham's brother and his girlfriend, inside the residence, the deputies reasonably believed based on Graham's statement that there were no other adults in the residence.

[19]Because the deputies lawfully discovered the sawed-off shotgun in Graham's residence, defendant Reid's argument that Graham's consent to the subsequent search was fruit of the illegal protective sweep is without merit.

briefly stop the individual to conduct a reasonable inquiry aimed at confirming or dispelling the suspicion. United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010) (citing Terry v. Ohio, 392 U.S. 1, 21, 30, (1968)). "Reasonable, articulable suspicion for a Terry stop requires less than probable cause of criminal activity, but the suspicion cannot be based on an inarticulate hunch." Id. Whether an officer had reasonable, articulable suspicion is determined by the totality of the circumstances, including the officer's deductions and rational inferences from relevant training and experience. Id.

The deputies were permitted to stop and pat-down Reid because they had reasonable, articulable suspicion that he was the owner of the seemingly-illegal firearm found in Graham's residence. After the deputies discovered the firearm, Graham stated that the firearm was owned by her boyfriend. When Reid arrived, he parked his vehicle next to Graham's residence, got out of his vehicle, and walked down the sidewalk toward Graham's residence. When Reid appeared to observe the officers and Deputy Wyatt, he immediately turned and began walking back toward his vehicle. Horton, 611 F.3d at 940 ("[U]nprovoked flight at the sight of an officer can contribute to reasonable, articulable suspicion."). Based on Reid's location and conduct, Deputy Wyatt asked Reid who he was, but Reid did not respond.[20] Cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion").

For security reasons and to keep the individual from leaving the area, the officers took the keys from the vehicle's ignition. Horton, 611 F.3d at 941 ("[A]n officer may temporarily detain an individual during a Terry stop to determine the suspect's identity or to maintain the status quo while obtaining more information."); United States v. West, 103 F. App'x 460, 461-62 (3d Cir. 2004) (affirming validity of Terry stop where officers took the defendant's keys, which the defendant

---

[20]Deputy Wyatt asking Reid for his name was not a seizure. United States v. Stewart, 631 F.3d 453, 456 (8th Cir. 2011) ("A seizure does not occur simply because a police officer approaches an individual and asks a few questions." (citation omitted)); accord United States v. Barry, 394 F.3d 1070, 1074-78 (8th Cir. 2005).

attempted to put in the ignition of his vehicle). Based on the discovery of the illegal firearm inside the residence and Graham's statement that the firearm belonged to her boyfriend, the officers reasonably believed that Reid was Graham's boyfriend and that Reid might be carrying a firearm on his person; the officers were permitted to pat-down Reid for weapons. Horton, 611 F.3d at 940-41 ("Once a suspect is legally stopped, an officer who has reason to believe the detained individual may be armed and dangerous may conduct a pat-down search for weapons to ensure officer safety.").

Subsequent events supplied the officers with probable cause to arrest Reid for illegally possessing the firearm discovered inside the Graham residence. "An officer has probable cause to make a warrantless arrest when circumstances would lead a reasonable person to believe a defendant has committed or is in the midst of committing an offense." United States v. Dembry, 535 F.3d 798, 800 (8th Cir. 2008). A probability, rather than an actual showing of criminal activity is sufficient. United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008).

TFO Alphin, who was stationed across the street during Reid's arrival at 712 Thrush, asked a nearby resident if she knew who the individual who had just arrived was. The resident stated, "Yes, this is Earnestine Graham's boyfriend." Graham's statement that her boyfriend was the owner of the illegal firearm, the neighbor's identification of Reid as Graham's boyfriend, Reid's arrival at 712 Thrush, and Reid's subsequent evasive behavior gave the officers probable cause to formally arrest Reid without a warrant for possession of the firearm. United States v. Williams, 616 F.3d 760, 765 (8th Cir. 2010) ("Probable cause does not require certainty regarding [a defendant's] identity.").

In sum, the officers had a sufficient, reasonable suspicion to stop and question Reid to determine whether he was the owner of the seemingly-illegal firearm discovered in Graham's residence. Graham's statement that the illegal firearm belonged to her boyfriend and Graham's neighbor's identification of Reid as Graham's boyfriend subsequently gave the officers probable cause to arrest Reid without a warrant.

**Examination of Reid's Keys**

The deputies were also permitted to examine Reid's keys in order to determine whether any of them opened the padlocked door in Graham's kitchen. While inside Graham's residence, the deputies encountered a padlocked door in Graham's kitchen. Graham stated that she did not have a key to the padlock and that her boyfriend had put the padlock on the door and had a key to the lock on his key ring. Following the search, Graham told Deputy McDaniel that Reid lived in the residence and that he had a key to the front door and a key to the padlock on the door in the kitchen. Deputy McDaniel then looked through the keys on the key ring taken from Reid's car and asked TFO Alphin whether a particular key was a padlock key. Reid overheard the question and volunteered that the particular key was the key to the padlock. Deputy McDaniel also confirmed that the subject key opened the padlock and that a key to the front door of the residence was also on the key ring.

Reid argues that examination of his keys exceeded the scope of a permissible Terry investigatory stop. When Deputy McDaniel examined Reid's keys, however, Reid had already been formally arrested. Reid was not asked whether the key to the padlocked door in Graham's kitchen was on his key ring; Reid volunteered the information after overhearing the deputies discussing this possibility. The owner of the residence, Graham, consented to the officers' search. Therefore, Reid's keys were lawfully seized and the examination of them did not exceed the scope of Terry.

**Reid's Statements**

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself in a criminal case. U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned before being interrogated that he has the right to remain silent and that any statement he makes may be used against him. Miranda v. Arizona, 384 U.S. 436, 444, 461 (1966); United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011). The requirements of Miranda, however, are triggered "only when a defendant is both in custody and being interrogated." United States v. Head, 407 F.3d 925,

928 (8th Cir. 2005). In addition, an individual may waive the rights contained in a Miranda warning, provided the waiver "is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444; accord United States v. Harper, 466 F.3d 634, 643 (8th Cir. 2006). The government bears the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. United States v. Boslau, 632 F.3d 422, 429 (8th Cir. 2011).

At the beginning of the interview at the ATF office, Agents Frank and Winn provided Reid with an "Advise of Rights and Waiver" form. Gov. Ex. B. Agent Frank orally read to Reid the statements of five rights on the form and the paragraph captioned "waiver" also printed on the form. Although Reid refused to sign his initials next to each of the five statements of rights on the form, Reid signed the form, thereby expressly acknowledging that he understood his rights and waived them. Agents Frank and Winn signed the form as witnesses to Reid's signing. E.g., United States v. Glenn, 403 F. App'x 133, 134 (8th Cir. 2010) (per curiam) (no Miranda violation where the officer informed the defendant of the nature of the Miranda waiver form and watched the defendant sign the form). At no time during the interview did defendant Reid invoke his right to remain silent or his right to have an attorney present on his behalf. United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999) (holding that the defendant's statements were admissible because he never invoked his right to remain silent or asked for an attorney and had been advised of and understood his Miranda rights). Nor did Reid's prior heroin use make his Miranda waiver involuntary; Reid understood the agents' questions, answered the agents' questions coherently, refused to answer certain questions, did not appear sleepy during the interview, and told the agents that although he used heroin earlier in the day, he did not feel sick. See Vinton, 631 F.3d at 483 (explaining that a Miranda waiver must be voluntarily, knowingly, and intelligently made). Therefore, defendant Reid's waiver of his Miranda rights was valid.

Similarly, defendant Reid's possible heroin withdrawal did not render his statements involuntary. The Supreme Court has stated that there is no constitutional right for "a criminal defendant to confess to his crime only when totally rational and properly motivated." Colorado

v. Connelly, 479 U.S. 157, 166 (1986). Thus, "coercive police activity is a necessary predicate to a finding that a confession was not voluntary within the meaning of the Due Process Clause." United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002). Although Reid's possible heroin withdrawal independently would be relevant to his susceptibility to police coercion, there is no evidence that the ATF agents engaged in coercive activity. Moreover, Reid's possible heroin withdrawal was not so strong as to cause his will to be overborne; he coherently answered the agents' questions, refused to answer certain questions, and told the agents that he was not feeling sick. United States v. Howard, 532 F.3d 755, 763 (8th Cir. 2008); United States v. Gaddy, 532 F.3d 783, 788-89 (8th Cir. 2008).

For these reasons,

**IT IS HEREBY RECOMMENDED** that the oral and written motions of defendant Warnell Reid to suppress physical evidence and his statements (Docs. 17, 27, 28) be denied.

**IT IS FURTHER RECOMMENDED** that the motion by the government for determination by the court of the admissibility of arguably suppressible evidence (Doc. 18) be denied as moot.

The parties are advised they have until close of business on February 24, 2012, to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

                                                          /S/   David D. Noce
                                          **UNITED STATES MAGISTRATE JUDGE**

Signed on February 7, 2012.